Final case for argument this morning is 151642, MacroSolve, Inc. v. Government Employees Ins. This is a case that should never have been brought. MacroSolve had no reasonable basis to accuse Newegg's mobile application of infringement. What MacroSolve accused as meeting the questionnaire and series of questions requirements in the claims was plainly no such thing. It is merely a listing of product categories. It is no more a questionnaire with a series of questions than a restaurant menu would be. This is a frivolous assertion. It was frivolous. It should have been frivolous to MacroSolve the moment that it looked at this patent and looked at what it was accusing. Now... Well, the problem for you is that the Supreme Court has told us that we have a deferential standard of review here and the district court's got a standard under high market octane in which they get to assess, he or she in this instance gets to assess whether this case stands out among others. What is there under the highly deferential standard of review that gives us a basis for overturning the judge in this case? Well, I think perhaps the most important reason why little to no deference is owed in this case is because the district court gave very scant attention to the majority of the arguments that were made by Newegg in connection with its motion. The questionnaire and series of questions issues are not touched at all in a district court's analysis. So right there is not a single finding to which the district court should be given any deference because there simply wasn't any analysis by the district court. And there are... He's presumed to have reviewed the arguments. He doesn't... It's not incumbent upon him to address every single argument that's made by your side. Well, I think it is incumbent upon him when Octane Fitness says that the totality of the circumstances are required to be addressed and specifically calls out that the parties litigating positions are part of that analysis. So when there are substantial arguments made by Newegg about litigating positions taken by Macrosoft throughout this case, for the district court not to expressly analyze and dispose of those arguments we think is error and requires at a minimum a remand to address those issues. In this case, we don't know that a remand would be required because the issues are very, very clear. Under governing law, as a matter of law, these issues must be resolved in Newegg's favor. However, it would be an abuse of discretion not to. The questionnaire series of questions issue being the most obvious one. This is a legal issue having to do with claim scope and for whatever reason the district court declined to actually resolve it. But what the district court did resolve was a dispute over whether the term questionnaire standing alone requires the presence of both questions and statements. In this case, the district court said, well, it doesn't have to have questions phrased with who, what, when, where, why, or with a question mark at the end. It can include certain kinds of statements, not any statements, but only certain kinds of statements that call for a response. The example that the district court gave- I see bullet points with different options, and so obviously you have to choose between those options. Would that be a questionnaire of sorts? I think, depending on how the options were presented, it may be a questionnaire within the district court's construction. Let's say there's no question marks. All it says is select one, and then there's five different options. I think that, at most, might be a single question, but the claims here require a series of questions, so that one, select one, and here are your options, would be, at most, a single question, not a series of questions. But the claims do require, at least the asserted claims require, that there be not one but a series of questions involved. Well, one of the things that the magistrate judge relied on, on the bad faith question, is that the court adopted positions of Microsoft's proposed claim construction on disputed terms and rejected most of Newegg's attempts to narrow claims through further construction. That's a finding. Is that reviewable under abuse of discretion, and how is that an abuse of discretion? Well, I think the mere finding that some of Microsoft's claim construction positions were accepted over Newegg's is, at best, a preliminary finding along the way to the ultimate merits. Regardless of what the constructions were that the district court adopted, that does not make Microsoft's infringement case have merit or not. That's only one piece of it. And in fact, here, even the term questionnaire, which Microsoft arguably won, still requires that the statements that are allowed to be present as part of that questionnaire be of a certain character, the kind that call for a response. We don't believe a list of product categories could meet that definition under any reasonable lens, but here we don't even have to rely on that because the claims go much further and distinguish between mere questionnaires that might include things other than questions and actual questionnaires like the asserted claims. We happen to have a strong claim differentiation in this case where the asserted claims require series of questions in the questionnaire. Other unasserted claims do not. The specification here is actually quite clear at distinguishing between a question and other  Column 8 includes reference. Although your arguments, obviously, you won the case on the merits. Although that support that conclusion, but nothing even the dialogue we're having this morning calls out to me to question the district court's evaluation of this case as not having stood out based on the totality of circumstances against all others as being reasonable. Well, again, your honor, I think the problem is the district court did not delve into the facts as presented to it and as required by Octane Fitness. For example, I mean, our case is about much more than just the position on questionnaire. It's about the motivation and what we think is a bad faith motivation on Macrosoft's part. It's about other issues where Macrosoft could not have reasonably expected to get proof of infringement. And what the district court actually did to deal with those arguments was incredibly cursory. For example, despite a considerable amount of evidence of Macrosoft's settlement history, Macrosoft's inability to tie the settlements to exposure on the part of any of those defendants, the district court dismissed all of that evidence in a single sentence that just says that Macrosoft asserted the 816 patent against a wide variety of defendants and settled many of those for significantly less than litigation costs does not alone show bad faith. And that's at page A11 in the record. Well, that is a tiny fraction of the evidence that was presented to the district court. I see various statements such as that in the district court opinion, and it got me to thinking about the totality of the circumstances. How do we determine what indicia do we look for that would indicate to us that the totality of the circumstances was considered by the district court, other than just maybe using the words? Are you saying that all of the theories that are advanced need to be addressed? Yes, I think that's exactly what it means. I think that if a party raises three different challenges to a plaintiff's infringement case, I think that those three challenges need to be addressed. Again, octane fitness goes beyond requiring a consideration of the totality, but specifically calls out an analysis of the party's litigating positions. So merely looking at one out of three, or a portion of one, or a portion of two is not enough. They addressed the, you don't like what she said or he said, but they addressed the evidence you put on on settlements and large number of suits. They addressed that they thought there was some give in terms of the theories that were presented. A lot of the theories weren't frivolous. Some of them were winners. Newegg kept changing its position. What more should they have addressed? I think they should have addressed the evidence. I think that it's incumbent on a district court, when asked to analyze the totality of the circumstances and the litigating positions, that it's not enough to find one fact that cuts in a party's favor and decide that that disposes of the entire argument without accounting for the evidence and law that is on the losing side of that argument, as the district court found it. So in the settlement context, for example, we have the district court not addressing the fact that MacRosolv was unable to tie the five figure nuisance value sums to any exposure by any defendant. And here we have, if you look at A1593 to 94 in the record, we have several dozen settlements companies, big and small, all around numbers, all within a range that we think is nuisance value. And as this court held in Killepass, if there was a good faith basis for why those numbers were the way they were, and if MacRosolv was correct that it's just because this technology is used only in small, one-off infringements, then that evidence would have been squarely in MacRosolv's possession, and we should expect MacRosolv to come forward with that. MacRosolv did no such thing. And as a defendant trying to prove bad faith, this court has recognized in Killepass that we are at a disadvantage to get those smoking gun admissions. So what we have is a considerable amount of circumstantial evidence showing that MacRosolv's story about why these settlements were paid, how the amounts were calculated, there's nothing MacRosolv can offer to substantiate that. But if I could just go back to circle back on the damages issue, I'm sorry, on the settlements issue for a moment. So their position is that these are a bunch of small, one-off settlements, which would imply that MacRosolv does not believe the patents are valuable, and yet they turn around and tell Newegg that Newegg owes $350,000 up to $32 million. And they tell GEICO at the same time that it owes $13.2 million. This is tremendously inconsistent with their story that these are just small, one-off inventions. This is just how their invention is valued and what it's worth in the marketplace. Now that alone might not show bad faith, but at the same time that they're telling Newegg that they might owe these huge damages amounts, they're also telling Newegg at $836.99 in the record that, hey, this case is about to get expensive, and you're aware of the average settlement, and we would hope for a counteroffer at least near that number. Now that, we think, is the best evidence of a smoking gun that we could hope to find in a case like this. Notably, MacRosolv is not talking about the merits of the case against Newegg. They're not talking about the merits of the cases against all those other defendants. They're simply saying, hey, we've asserted this patent a lot. This is the average settlement. You should pay it. And again, this is against the backdrop of demanding many orders of magnitude more from Newegg in its expert report. Did MacRosolv initiate suit against other defendants during the course of this matter? Yes, Your Honor, it did, and it initiated 11 new lawsuits after the reexamination petition was granted, and so it had been instituted, and we think that's an important fact because Had there been a decision yet on the reexamination? At the time those lawsuits were filed, no, there had not been a determination by the But it had already settled with the other defendants? It had already settled with, I believe, the majority, if not all, of the other defendants at the time. How many was there? You said dozens. Are we talking about? I believe the total number is 63 as of the time that MacRosolv represented that figure to the patent office. There may be a handful more. 63? 63 settlement licenses, averaging $75,000 each. So I see I'm into my rebuttal time, so I will reserve that. Thank you. Good morning. Good morning. Please the court, Matt Antonelli for MacRosolv. I want to start with a series of questions that my friend started with, and MacRosolv was not surprised here when Newegg moved for fees. That was not a surprise. It's not a surprise that we're here on appeal. But what was a surprise? Perhaps we can hear you. Yes, sir. It was not a surprise when Newegg moved for fees. That was not surprising to us. But what was a surprise was the nature of the arguments that were raised and what was alleged to have been an baseless position below, an unreasonable position below. The reason those issues were surprises was they were both issues on which Newegg teed up the issue for Markman, tried to distinguish our infringement theory as a claim construction issue. And they were both issues on which Newegg either lost the issue or abandoned the issue. And this series of questions example that my friend focused on, I think, I'll focus on that one as well. There was a second one, and the same kind of reasoning applies. My friend says that the district court abused its discretion. Judge Mitchell abused his discretion, and Judge Schneider then, in turn, abused his arguments because they barely touched them. But the truth of the matter is that Newegg barely touched those arguments below. If you look at Newegg's opening brief seeking fees, they were primarily focused on this other issue. It was a few sentences on the series of questions issue in the opening brief. And when it came time to file objections to the district court judge, Judge Schneider, Newegg dropped it. This was not a big issue below. And so when the district court did not give a lengthy discussion of that issue, but instead focused on the other example, that was purely in line with the way the issues were argued below. And that's the reason for that. But in any event, on the substance of those issues, on that issue, we do not lose. The district court actually ruled in our favor on that issue. Why did you settle them? Excuse me? Why did you settle and dismiss a lawsuit? It's completely orthogonal reason, Judge Reyna. For what? Completely orthogonal reason. Completely unrelated reason. What happened was there was a re-exam. I think one of the reasons is that you didn't have the resources to continue the lawsuit, right? No, sir. That's not? It is not. OK. The reason... So, Microsoft had a separate source of litigation funding. It wasn't costing Microsoft to continue these lawsuits. What did cost Microsoft was the Patent Office actions. And the reason why this lawsuit was dropped, the suit against Newegg was dropped, as well as every other lawsuit that was pending at the time, was because of what happened in the Patent Office. What happened in the Patent Office was there was a re-exam that had been separately filed by Newegg's co-defendant, Geico. And it came to a point where there was an office action, a final office action, rejecting the claims. And at that point, Microsoft decided we are not going to spend more money in the Patent Office. The writing's on the wall. This patent's going to be invalidated. That was Microsoft's belief at that point. And for that reason, Microsoft said, we're going to do the right thing. We're not going to continue this lawsuit. And the day... It was a day after or second day... You can infringe an invalidated pen, can't you? Excuse me? You can still infringe a pen that's been invalidated. The patent was going to be invalidated in front of the Patent Office before we ever got to a judgment in the district court decisions. And so you can infringe a patent that's invalid in the sense that the claims can be infringed, but you can't have liability for infringement at the end of the day if the patent's invalid. And it was clear that this patent was going to be invalidated at that point based on what was happening in the Patent Office. And Microsoft immediately... The timing was interesting. There was a mediation with Newegg scheduled for the day after or two days after. We came into that mediation and said, hey, something new has happened here in the Patent Office. And based on that, we are not going to continue this lawsuit. And we didn't just dismiss against Newegg. We didn't just dismiss against Geico, who was also at the mediation. But we dismissed against every other case that was pending. And that was the end of this enforcement campaign. So in a situation like... What happens to all your licenses? You settled out with 60 defendants. Do you... Well, they stay the way they are? In what sense? Well, do you return the money? Do you... No. So the settlements are, of course, negotiated so that the money is not returned. And they risk that... I mean, the settlements are actually obviously in compromise of issues like defenses of inflicted that could be raised. The patent might be invalidated. I say that because it seems to me that in the course of a lawsuit, there's many stages where the parties are reevaluating their strengths and weaknesses. And some will settle on a perceived weakness, and others may continue on a perceived strength. You settled on a weakness, on a perceived weakness, but yet you brought lawsuit. You were wrong, I mean, in bringing the lawsuit. We did not file a single lawsuit after the event in the patent office. So the timing was the adverse event that affected us, that affected Microsoft's ability to continue to go forward. Did you think the patent office was going to find in your favor? Yes, sir. The re-exam was instituted. It was instituted on prior that had nothing to do with our case. It was totally separate arguments. But at some point during that re-examination process, when we got to a final adverse action, we said, look, this is looking like it's an uphill battle. And not only that, but then an additional re-exam was filed, an IPR. And this was right contemporaneous with statements from former Chief Judge Rader, calling these IPR processes death squads. Microsoft was scared of pushing more money into the patent office to fight this multi-front war, and wanted to focus on its continuation application with the funds it had available. But at that point, that was the first adverse action that happened in the entire history of this campaign. And that's the point at which we abandoned it, and said we're not going to continue this. We could have spent money, continued to appeal that patent office, and tried to get to a judgment first. We didn't do that. If we had done that, you'd sure be hearing from Newegg today that that was the wrong course of action. That was the abuse of action. What about the argument that the district court or the magistrate judge never addressed most, the vast majority of the arguments? So that's not true. The district court addressed everything that Newegg advanced, Judge Prost. So there were essentially two arguments on the merits, the one having to do with questionnaire, and the one having to do with the user causing the termination step. And on those two issues, the Judge Mitchell said that the not only didn't, it wasn't even an issue where these were close, and we had a debate about how close they were. The issue was that these were teed up as claim construction disputes. And it wasn't that Newegg had shifting and inconsistent claim construction positions, and were kind of bad actors for that reason, and we're not going to address these things. The point that was made in Judge Mitchell's decision was those shifting and inconsistent claim construction positions actually showed that the arguments that Newegg was making on its fee motion were not reasonable arguments. The word that the district court uses, that Judge Mitchell uses, was they refuted those arguments. And the reason that is is that Newegg either lost these arguments or gave them up. On the series of questions, Newegg has a whole argument. It doesn't agree that we won. We think we won. We lay that all out in our briefs, the reasons why we think we won on that issue. I think it's clear. And I think it's at least a reasonable reading of the district court's decision, Judge Mitchell's decision. But if you gave Newegg all the benefit of the doubt on those issues, if you assumed that we actually, that the district court did not rule in our favor on that issue, and if you assume, like I think you would have to to make Newegg's argument work, that we unreasonably construed the district court's decision, that's still wouldn't get Newegg where it needs to be. Because the only place that would leave Newegg is that the issue was still left open. So the district court ruled that a questionnaire doesn't have to be, it's not just questions, but it's any kind of statement that calls for a response. And Newegg's whole argument is, well, we still have the series of questions to hang our hat on. By the way, that was a brand new argument raised for the first time at the Markham hearing. So Newegg did not do a good job of actually trying to get the court to rule on that issue, which now says is the obvious day one issue that made MacRussell's case frivolous from the beginning. On that series of questions argument, Newegg, if you accept everything that Newegg tells you, all it is is leaving the issue open. And so then the question becomes, was it outlandish, was it crazy for MacRussell to take the position that when a questionnaire can include statements calling for responses, was it outlandish for MacRussell to say, well, OK, when the claim says there's questions that comprise the questionnaire, those questions that make up the questionnaire, those can also be statements calling for responses. They don't have to have jeopardy in the form of a question with a question mark. Doesn't have to be that. That was not an outlandish position. And there's certainly nothing, if it was such a crazy outlandish position, it's one that should have been raised earlier. What about the argument that your assertions of infringement were improbable, that it would have been even in the most remote situation that infringement could have occurred. And with that, also address the arguments with respect to the inducement. So those arguments center around this termination. You either have to terminate the connection that we've discussed. And we have a very similar history on Markman, and I won't go through all that, but it's right in the district court's decision. Let me see if I understood that correctly. In the claims that you assert, termination is part of the process, correct? Yes, sir. And in the accused methods, termination is not part of the process, but yet you argue, well, termination could occur if there's a weak signal, you walk into a basement, something happens, and then you reconnect. So you can have termination under any circumstance. Did I get that right? I do not agree with that, Judge Rayner. That distinction is not accurate. I do not believe it. And here's why I do not agree with that. What the claims of this patent were about were exactly what we're accusing of infringement. So there was a set of steps that had to do with creating the questionnaire, sending the questionnaire to the device, tokenizing the questionnaire, and that's an important feature for other reasons, sending these questionnaires to the devices, and then in the course of filling out the devices, there are steps where you establish network connections and terminate network connections. So at every step, it seems like you would take a step and then you would terminate connection with respect to the preceding step. Not at every step. There was an establishing step and a terminating step, and the timing of those steps was actually... Well, at least in two steps, right? Yes. Those two steps where that termination happened. Correct. I never read that the accused method had any type of termination in it. It does. And so what was accused of infringement was in Newegg's mobile app, for example, when a person is choosing options on some kind of questionnaires, there are other questionnaires where they're filling out forms. We actually demonstrated this in our expert report by sort of creating an artificial network outage by using airplane mode and we'd be in the middle of typing in some information. We'd create the artificial network outage using airplane mode. We'd see that the information was still there. We'd then move to... You could fill in more information. We'd then flip the connection back on, turning airplane mode off, and then you'd be able to continue. And that was exactly what was required by the claims. And that was the whole purpose of the patent. The patent was all about these mobile devices used to collect information in a situation where you have unreliable networks. And that's what the dispute about this terminating... the Markman dispute about this terminating connections was all about. The dispute that was teed up was Newegg said, hey, it's just not networks just going down sort of on their own. It's got to be a user terminating the connection. And Newegg eventually, during the Markman process, after we filed our Markman brief first, we explained why that was wrong. We explained that it's really about unreliable networks. That's what the whole patent is about. Newegg, in its response, abandoned that position. And they say they didn't really abandon it, that they were leaving it open somehow, but they abandoned any attempt to have the court actually construe that to require it to be a user causing the termination. So these terminations happen. Now, we get all kinds of arguments that had nothing to do with what was below, but like in the reply brief, we get arguments that the odds of this ever happening were effectively zero. And those kind of arguments are brand new. They don't have any evidentiary support. But in any event, they're just arguments, and we had evidence on our side. Our expert said these things inevitably happen. There were millions of circumstantial evidence. Obviously, we didn't know that with respect to John Doe, the network went down at 12.30 on Tuesday and one of these things happened. But what we had was the kind of circumstantial evidence about the nature of these networks, their unreliability, the fact that these kind of connections and Wi-Fi connections and cellular connections are always going down on a routine basis. And we had millions and millions and hundreds of millions of screen renderings through the use of the Newegg mobile app. And that was enough to be sure that this was happening at least to some extent. So that was the basis of our infringement analysis. But let's be clear, Newegg is not saying that it's impossible to have proven this. So even if our indirect evidence wasn't enough, that doesn't mean our case was exceptional. And Newegg has not come forward with any evidence to show that this doesn't happen. So the idea that this was some case that from day one was obviously flawed and should have never been brought, that just doesn't fall from anything Newegg has argued here. Thank you. Thank you. A few brief points about the idea that Newegg lost or abandoned its arguments. I think our briefing is clear about that. The issue of whether a questionnaire was limited to questions was moot because the asserted claims require a series of questions. And as far as what a series of questions means, I think everybody understood. I think the district court understood that by limiting or by not limiting questionnaire to questions, that clearly a expressed statement in the claims that questions were required did require questions. The spec is consistent with that. At column 8, 12 through 14, you have series of questions or statements being referred to. At column 8, line 52, it refers to a, quote, form that asks the user different questions. Paren, are you a man or a woman, question mark. There's just nothing in the spec here that would say that series of questions means anything other than questions, as we ordinarily understand the term. As far as the Newegg abandoned, the user has to take action to disable the first connection. Again, that's sort of a moot point because the way Microsoft accused Newegg's app was requiring actions by a user. And that's the only way it ever could have accused Newegg, because Newegg does not control customers' phones into airplane mode or not. Newegg does not control Wi-Fi networks and cellular networks. So it was inevitable, whether we got an express construction or not, that Microsoft could never have proven that Newegg controlled that step or that Newegg actively was able to encourage that step. My friend here says that Newegg never actually briefed the questionnaire issue at A3114 through 15 and A3120. We have Newegg arguing those issues to the district court in a very short 15-page opening brief and a five-page reply brief. We've got about three pages of argument to that issue. The district court should not have been able to ignore that. Also at A3689 through 90 in the reply brief, that is. As far as the re-exam, we really think the re-exam is largely a sideshow and is somewhat irrelevant because the premise of our exceptionality motion was that Microsoft brought a frivolous infringement case and did so in bad faith. The fact that Microsoft's patent was also invalid, which it doesn't disagree with because it never challenged the re-exam on that basis, certainly doesn't help macro-solve and doesn't excuse it from bringing frivolous claims in bad faith, as the record shows. The idea that it was inevitable to, Your Honor, may I finish my final point here? The idea that it was inevitable that this infringement would occur, that was never an acceptable theory under this court's precedent when this case was brought. You look at the Takeda case, knowledge that infringement might possibly occur has never been enough for active inducement of infringement. And if it is so clear that infringement necessarily must have occurred, then this court in e-pass recognized, well, then Microsoft should have had no trouble finding at least one instance where it did. But the precise context of these claims made it so unlikely as to be impossible. And that's why macro-solve came up empty handed after two years of discovery. Thank you. We thank both counsel. The case is submitted and that concludes our proceedings. I'll rise. The Honourable Court is adjourned until tomorrow morning at 10 o'clock.